Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, SITI AISHAH RIDZUAN

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SITI AISHAH RIDZUAN, on behalf of herself and all similarly situated persons,<br><br>Plaintiff,<br>v.<br><br>LENDINGTREE, LLC, a Delaware limited liability company,<br><br>Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

Plaintiff SITI AISHAH RIDZUAN ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant LENDINGTREE, LLC, a Delaware limited liability company ("Defendant" or "LendingTree"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.lendingtree.com (the "Website"), a website that Defendant provides for public access and use.

2. During her use of the Website, Plaintiff navigated to multiple pages, including pages concerning debt consolidation loans for persons with bad credit and personal loans for persons with bad credit, unaware that Defendant was causing and permitting the Third Parties to intercept the contents of her communications and reveal her content interests.

3. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs and page titles identifying what she was browsing and the referrer URLs reflecting prior navigation, which were transmitted to the Third Parties during the page-load process itself.

4. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs and page titles reflecting in human-readable terms what users are browsing and applying for, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including remarketing, conversion measurement, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising.

5. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class period in this case and continuously through to today and ongoingly.

## II. GENERAL ALLEGATIONS

6. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

7. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, page titles, and referrer URLs reflecting prior navigation.

8. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- The Google Tracker
- The Blueshift Tracker

9. The third parties who operate the above-listed trackers use the intercepted contents of users' communications collected via the Website for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers" and their operators below are referred to collectively as the "Third Parties."

10. The Trackers are operated by Google LLC (as to the Google Tracker) and Blueshift Labs, Inc. (as to the Blueshift Tracker).

11. Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load and navigation. As a result, Defendant causes the interception and transmission of the

contents of users' electronic communications with the Website to servers controlled by the Third Parties. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's deliberate configuration and are not necessary to render the Website's core content or functionality.

12. The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints as an automatic part of the same page-load transaction and without any user interaction or authorization.

13. Plaintiff did not give prior express consent to the interception of the contents of her communications by the Trackers. Plaintiff was never presented with, and never saw, any consent banner, pop-up, or cookie-consent interface on the Website asking her to accept or reject third-party tracking, and the Website obtained no prior express consent from Plaintiff before deploying the Trackers to intercept the contents of her communications.

14. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

15. Plaintiff SITI AISHAH RIDZUAN is a California citizen residing in Contra Costa County, California, and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on June 27, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

16. Defendant LENDINGTREE, LLC is a Delaware limited liability company that owns, operates, and controls the Website, an online loan and financial-services marketplace through which LendingTree markets consumer-credit products, including personal loans and debt consolidation loans, publishes editorial content concerning

consumer credit and personal finance, and solicits and collects consumer loan inquiries. LendingTree, LLC operates as a licensed mortgage broker and marketing lead generator under Nationwide Multistate Licensing System Unique Identifier No. 1136.

17. LendingTree, LLC maintains its principal place of business at 1415 Vantage Park Drive, Suite 700, Charlotte, North Carolina 28203, and operates the Website nationwide, including in California. The Website states that it is directed at, and made available to, persons in the continental United States, Alaska, and Hawaii. Through the Website and related digital platforms, LendingTree conducts a national consumer-lending marketplace business and serves consumers in California, including in this District, and throughout the United States.

## IV. JURISDICTION AND VENUE

18. Defendant LendingTree, LLC is subject to specific personal jurisdiction in this District. Defendant has purposefully directed its commercial activities to California; the claims asserted in this Complaint arise out of and relate to those California-directed activities; and the exercise of jurisdiction comports with traditional notions of fair play and substantial justice.

19. Defendant operates the Website on a nationwide basis for a national consumer audience and purposefully and continuously serves California consumers. Plaintiff is a California citizen who accessed the Website from her California residence, and the substantial harm alleged in this Complaint occurred in California.

20. Defendant publishes California-specific consumer content on the Website, including California-specific product pages concerning California car insurance, California home insurance, and California renters insurance. In February 2012, Defendant announced through a press release that it had opened a “marketing headquarters” in Burlingame, California, describing it as a “permanent address” for its Bay Area marketing and design team. On information and belief, based on third-party business-location directories, Defendant currently maintains California office locations, including in San Mateo and Rancho Cordova, California.

21. Defendant publishes a State Law Privacy Notice expressly addressing the rights of California-resident consumers, and a separate privacy notice for California-resident job applicants and employees structured to comply with the California Consumer Privacy Act. In the latter notice, Defendant states that it may sell or share California residents' identifiers and internet or other electronic network activity information for marketing and advertising purposes to its analytics providers and its marketing and advertising partners, including social media platforms and third-party advertising networks. These California-specific provisions are evidence that Defendant's commercial conduct is purposefully directed at, and subject to, California's consumer-protection regime.

22. Defendant deliberately contracts with advertising, audience-measurement, and data-monetization service providers to deliver advertising and analytics on the Website to California consumers. Defendant's commercial business model relies on collecting California consumer browsing and loan-inquiry data, sharing data with third-party advertising and analytics partners, and monetizing California consumer audiences through the digital advertising marketplace. By structuring its commercial operations to capture and monetize California consumer browsing data, Defendant purposefully avails itself of California's consumer-data marketplace.

23. The claims asserted in this Complaint arise directly from Defendant's California-directed conduct: Defendant caused the interception of Plaintiff's electronic communications while Plaintiff was in California, transmitted the substantive contents of those communications to third-party tracking infrastructure, and profited from the sharing and commercial use of California consumer browsing data. The exercise of personal jurisdiction in this District over a defendant that has deliberately structured its commercial operations to capture and monetize California consumer browsing data comports with traditional notions of fair play and substantial justice.

24. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18

U.S.C. § 2520, which provides a civil cause of action for violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a).

25. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

26. This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because there are more than 100 putative Class Members, the amount in controversy exceeds $5,000,000 in the aggregate exclusive of interest and costs, and minimal diversity exists because Plaintiff is a citizen of California and Defendant is a citizen of Delaware (its state of organization) and North Carolina (the location of its principal place of business).

27. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant operates the Website that serves California residents in this District; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, including Plaintiff's California-located use of the Website from her Contra Costa County residence and the interception of her communications at her location in this District; (3) Plaintiff resides in this District; and (4) Defendant is subject to personal jurisdiction in this District with respect to this action.

## V. FEDERAL AND STATE PRIVACY LAWS

### 1. The California Invasion of Privacy Act (CIPA)

28. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized

society" (Cal. Penal Code § 630).

29. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

30. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. CIPA codifies a substantive right to privacy, the violation of which is a concrete injury. Plaintiff's injury is concrete and particularized for the further reason that the interceptions disclosed to third parties the specific contents of her communications, including the URLs and page titles disclosing that she was reading Defendant's pages concerning debt consolidation loans for persons with bad credit and personal loans for persons with bad credit. The subject matter of those pages is financial distress and impaired credit, and a reasonable person regards that category of information as private.

31. Those communications were not disclosed anonymously. Each was transmitted together with a persistent identifier that singled out and followed Plaintiff's browser, and in each instance that identifier had been assigned to her browser before the session in which her communications were intercepted, so that the pages she read were appended to a record of her activity that already existed and that persists after the session ended.

32. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

**2. The Federal Wiretap Act**

33. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy

Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

34. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

35. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. SPECIFIC ALLEGATIONS

36. Plaintiff personally used the Website during the class period, including on June 27, 2026, and preserved an HTTP archive file, commonly known as a HAR file, of one of her own browsing sessions. A HAR file is a record of the network exchanges between a browser and the servers with which it communicates, including the requests the browser sends, the headers and parameters those requests carry, and the responses received. Plaintiff's HAR file accordingly records the requests her browser transmitted to the Third Parties during that session, including the named parameters carrying the contents of her communications and the persistent identifiers transmitted with them. The figures reproduced below are from an independent technical investigation counsel

commissioned, which replicated the URLs and user flows recorded in the HAR file, and are included as corroboration.

37. During her use of the Website, Plaintiff navigated to the following pages, unaware that Defendant was causing and permitting Third Parties to intercept the content of her communications:

- https://www.lendingtree.com/debt-consolidation/debt-consolidation-loans-for-bad-credit/; and
- https://www.lendingtree.com/personal/best-personal-loans-for-bad-credit/.

38. The tracking mechanisms described below operated on the Website during Plaintiff's visits to the URLs identified above and intercepted the substantive contents of Plaintiff's electronic communications with the Website, including the page URLs and page titles identifying the topics Plaintiff was reading and the loan-application form she had navigated to.

39. No parameter transmitted with any Tracker request described below limited the Tracker's receipt or use of the contents of Plaintiff's communications, and no parameter anonymized, redacted, or obscured those contents. The Trackers accordingly received the contents of Plaintiff's communications at full fidelity.

**1. The Google Tracker**

40. Defendant embedded and deployed Google advertising code on the Website, operated by Google LLC through its remarketing advertising platform. Defendant configured that code under its own Google Ads conversion identifier, which is carried in the address of the transmissions described below. The Google Tracker fires automatically when users load pages on the Website. It is not a resource Plaintiff requested, and it is not necessary to render any page of the Website or any of the Website's content or functionality.

41. Plaintiff's browser began loading each page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the

browser executed the Google Tracker's code. That code obtained the full address of the page then being loaded, the title of that page, and the address of the referring page from the browser's state for the page then being loaded, wrote those values into named parameters of new requests, and directed Plaintiff's browser to send those requests to Google's servers at www.google.com/pagead/1p-user-list and www.google.com/rmkt/collect.

42. When Plaintiff navigated to Defendant's page at https://www.lendingtree.com/debt-consolidation/debt-consolidation-loans-for-bad-credit/, the Google Tracker transmitted an outbound request to www.google.com/pagead/1p-user-list that carried, in named parameters, the full address of that page and its full title, "Debt Consolidation Loans for Bad Credit Rates in June 2026 | LendingTree".

43. When Plaintiff navigated to Defendant's page at https://www.lendingtree.com/personal/best-personal-loans-for-bad-credit/, the Google Tracker transmitted outbound requests to www.google.com/pagead/1p-user-list and www.google.com/rmkt/collect, each of which carried, in named parameters, the full address of that page and its full title, "Best Loans for Bad Credit in June 2026 | LendingTree". Each of those requests also carried, in a named parameter, the address of the page Plaintiff had been reading immediately before, and the same persistent identifier for Plaintiff's browser.

44. The identifier that accompanied the contents in the Google transmissions was not created during Plaintiff's session. The value carried in that named parameter encodes the time at which Google first assigned it to Plaintiff's browser, and that time was on the day before the session in which her communications were intercepted. In the request headers accompanying those same transmissions, Plaintiff's browser also transmitted to Google a stored Google advertising cookie whose value likewise encodes an assignment time on that same earlier day. Google therefore received the contents of Plaintiff's communications already joined to identifiers by which it could recognize her

browser from a previous visit.

45. Figure 1 is a network capture showing an outbound transmission to www.google.com/rmkt/collect during the load of the Website's "Best Loans for Bad Credit" page. The transmission carries the full page URL, including the path best-personal-loans-for-bad-credit, the page title in its "tiba" parameter, a persistent "auid" identifier, and an "npa=0" parameter, with the Origin and Referer headers confirming that the request originated from the Website.

**Figure 1**



46. Google's servers returned HTTP 200 responses to each of the Google Tracker requests described above, confirming that Google received the transmitted data.

47. Google LLC is an independent company that operates its own advertising and audience-measurement business. It had the capability to use the contents of Plaintiff's communications for its own independent commercial purposes, including the construction of audience segments, and on information and belief it did so.

48. Google publishes documentation describing what it does with the information this code collects. In an article addressed to advertisers who deploy the Google tag, titled Tag your website using Google Ads and published at

https://support.google.com/google-ads/answer/2476688, Google states that the information collected includes the page URL and title, and that this information is used to create data segments comprised of the advertiser's website visitors. Creating a data segment from the address and title of a page a person has viewed requires Google to receive those values and to determine what they signify, which is to read them.

49. Google LLC is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant did not obtain Plaintiff's consent before causing Google to intercept the contents of Plaintiff's communications with the Website. These acts constitute violations of Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**2. The Blueshift Tracker**

50. Defendant embedded and deployed a Blueshift tracking mechanism on the Website, operated by Blueshift Labs, Inc. through its marketing-automation and customer-engagement platform. Defendant configured that code under its own Blueshift account key, which is carried in the address of every transmission described below. The Blueshift Tracker fires automatically when users load content pages on the Website, transmitting paired requests to api.getblueshift.com/unity.gif. It is not a resource Plaintiff requested, and it is not necessary to render any page of the Website or any of the Website's content or functionality.

51. Plaintiff's browser began loading each content page from Defendant's servers. As part of that same page load, and without any further request or action by Plaintiff, the browser executed the Blueshift Tracker's code. That code obtained the full address of the page then being loaded and the address of the referring page from the browser's state for the page then being loaded, together with the value of a cookie stored on Plaintiff's browser under Defendant's own domain, wrote those values into named parameters of new requests, and directed Plaintiff's browser to send those requests to Blueshift's servers at api.getblueshift.com/unity.gif.

52. When Plaintiff navigated to https://www.lendingtree.com/personal/best-

personal-loans-for-bad-credit/, the Blueshift Tracker transmitted paired requests to api.getblueshift.com/unity.gif that carried, in a named parameter, the full address of that page. Each transmission carried, in a further named parameter, the same identifier value, which was the value Defendant stored on Plaintiff's browser as Defendant's own anonymous visitor identifier, and which was already present on Plaintiff's browser before the session began. That value was identical in all ten Blueshift transmissions in Plaintiff's session, linking each page she read to a single persistent record of her browsing.

53. Blueshift likewise received the full URL of the debt-consolidation page Plaintiff had been reading: the Blueshift transmissions emitted on the page Plaintiff visited next carried, in their referrer field, the full URL https://www.lendingtree.com/debt-consolidation/debt-consolidation-loans-for-bad-credit/, together with the same stable user identifier.

54. Figure 2 is a network capture showing an outbound transmission to api.getblueshift.com/unity.gif during the load of the Website's "Best Loans for Bad Credit" page. The transmission carries the full page URL, including the path best-personal-loans-for-bad-credit, in its "u" parameter, an account key in its "x" parameter, a stable user identifier in its "k" parameter, and a "pageload" event designation, with the Origin and Referer headers confirming that the request originated from the Website. The session list shows the paired "identify" and "pageload" transmissions.

/ / /

/ / /

/ / /

**Figure 2**




55. Blueshift's servers returned HTTP 200 responses to each of the ten Blueshift Tracker requests in Plaintiff's session, confirming that Blueshift received the transmitted data.

56. Blueshift Labs, Inc. is an independent company that operates its own customer-data and marketing-automation business. It had the capability to use the contents of Plaintiff's communications for its own independent commercial purposes, including the construction and enrichment of persistent customer profiles keyed to the identifier it received, and on information and belief it did so.

57. Blueshift publishes documentation describing what it does with the data it receives. In an article titled Customer identifiers and profile unification, published at https://help.blueshift.com/hc/en-us/articles/6479978144275-Customer-identifiers-and-profile-unification, Blueshift states that cookies are among the standard identifiers it uses to identify customers, that a first-party cookie is used on the operator's website to track anonymous website behavior, and that it builds a single profile for each customer by tracking behavioral and event data for anonymous as well as signed-in customers across devices and sessions. Attaching a page a person has viewed to a profile held under a cookie identifier requires Blueshift to receive the address of that page together with the

identifier and to determine that the two belong together, which is to read them.

58. Blueshift Labs, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant did not obtain Plaintiff's consent before causing Blueshift to intercept the contents of Plaintiff's communications with the Website. These acts constitute violations of Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

**3. Interception While in Transit**

59. For each page described above, two sets of code ran as part of a single attempt by Plaintiff's browser to load a page from Defendant's servers. The first set retrieved the page Plaintiff had asked for and displayed it to her. The second set was the Trackers' code, which delivered nothing to Plaintiff and returned no content she could see or use.

60. The Trackers did not obtain the contents of Plaintiff's communications from any stored record kept by Defendant. There was no separate transaction between Defendant and the Trackers. The values the Trackers transmitted were read from the state of Plaintiff's own browser for the page then being loaded, and they identified that page and no other.

61. The transmissions to the Trackers were therefore initiated by the Trackers' own code and were concurrent with Plaintiff's communications with the Website, and the Trackers acquired the contents of those communications while they were in transit and while they were passing over a wire, and not from any stored record created after those communications had ended.

62. No action by Plaintiff was required for any of this to occur, and none of it was visible to her. Plaintiff did not request the Trackers' code, was not shown the transmissions it caused, and had no means of observing or preventing them in the ordinary use of the Website.

63. Defendant knew of and configured this arrangement. Defendant's own

account identifiers are carried in the transmissions to each Tracker, Defendant's own first-party code and tag manager cause the Trackers to load, and Defendant transmitted Plaintiff's advertising click identifier to Google and its own anonymous visitor identifier for Plaintiff's browser to Blueshift, alongside the contents of Plaintiff's communications.

## VII. CLASS ALLEGATIONS

64. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more Trackers at any time within the applicable limitations period preceding the filing of this Complaint and through the present.

65. NUMEROSITY: Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

66. COMMONALITY: Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant aided, agreed with, employed, or conspired with the Trackers within the meaning of the fourth clause of Cal. Penal Code § 631(a);

- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether the Defendant's conduct violates the California Constitution;
- Whether the Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

67. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical of Class Members' experience.

68. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

69. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

/ / /

# VIII. FIRST CAUSE OF ACTION

## Violations of Cal. Penal Code § 631

## By Plaintiff and the Class Members Against Defendant

70. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

71. Plaintiff brings this cause of action on behalf of herself and the Class.

72. California Penal Code § 631(a) imposes liability on any person who, without the consent of all parties to the communication, reads, or attempts to read, or learns the contents or meaning of any message, report, or communication "while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state" (the second clause); on any person who uses, or attempts to use, in any manner or for any purpose, any information so obtained (the third clause); and on any person who "aids, agrees with, employs, or conspires with" any person to do any of the foregoing acts (the fourth clause).

73. The Trackers are third parties to the communications between Plaintiff and the Website, and neither became a party by providing analytics, measurement, or transmission services. Each Tracker is operated by an independent company that runs its own data business, and each had the capability to use the intercepted communications for its own independent purposes: Google to build audience segments, and Blueshift to build persistent customer profiles for marketing automation.

74. Each Tracker violated the second clause of § 631(a). While Plaintiff's communications with the Website, including her page URLs and page titles, which are the contents of those communications, were being transmitted between Plaintiff's browser and the Website's servers, code that Defendant caused to execute in Plaintiff's browser duplicated each such communication and transmitted a copy, through a separate but simultaneous channel and as an automatic and integral part of the same page-load transaction by which Plaintiff communicated with the Website, to the Tracker's own servers, where the Tracker read, attempted to read, and learned the contents by receiving

the URLs and titles in plain, human-readable text and determining what they signified. The Trackers acquired the contents while Plaintiff's communications with the Website were in transit and ongoing, and not from any stored record created after those communications ended.

75. Defendant is liable under the fourth clause of § 631(a) for aiding, employing, and enabling the Trackers' violations of the second clause. Defendant knowingly and intentionally embedded the Trackers' interception code on the Website and configured it, through Defendant's own tag-management deployment, to execute automatically on the relevant page loads. Defendant transmitted Plaintiff's advertising click identifier to Google, and transmitted its own anonymous visitor identifier for Plaintiff's browser to Blueshift, alongside the intercepted contents, actively linking those communications to persistent profiles of Plaintiff. Defendant configured neither Tracker to anonymize the contents it received or to limit the Tracker's use of them. Defendant intentionally configured the Website to transmit Plaintiff's and Class Members' URL contents to each Tracker, and permitted each Tracker to use that information for user profiling and targeted advertising. Defendant knew that the Trackers were thereby intercepting and using the contents of users' communications for the Trackers' own commercial purposes, as shown by Defendant's deliberate configuration of each Tracker, its transmission of its own identifiers alongside the intercepted contents, and the Trackers' openly described advertising and marketing-automation functions. Defendant's knowing, intentional embedding and identifier-forwarding provided substantial assistance to the Trackers' interceptions. Plaintiff and Class Members did not consent to interception of the contents of their communications by either Tracker, and no exception to § 631(a) applies.

76. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

## IX. SECOND CAUSE OF ACTION

**Violations of 18 U.S.C. § 2511(1)(a)**

**By Plaintiff and the Class Members Against Defendant**

77. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

78. Plaintiff brings this cause of action on behalf of herself and the Class.

79. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

80. The full URLs and page titles of Plaintiff's and Class Members' communications with the Website, including URLs whose paths identify debt consolidation loans for persons with bad credit, and personal loans for persons with bad credit, are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). They communicate the substance and meaning of Plaintiff's and Class Members' browsing. As described in the preceding tracker-specific allegations, code that Defendant caused to execute in users' browsers duplicated each such communication and transmitted a copy, through a separate but simultaneous channel and contemporaneously with the same page-load transaction, to the Trackers' servers, while the user's communications with the Website were in transit and ongoing, and not from any stored record created after those communications ended.

81. The Trackers, not Defendant, are the interceptors: each intentionally intercepted the contents of Plaintiff's electronic communications during transmission, and none is a party to those communications. A person who causes a user's browser to duplicate a communication and transmit it to a third party through a separate but simultaneous channel is not a party to that communication and is not exempt. Defendant is liable under 18 U.S.C. § 2511(1)(a) because it intentionally procured the Trackers to intercept Plaintiff's and Class Members' electronic communications, by knowingly

embedding and configuring the Trackers' interception code on the Website and transmitting its own identifiers alongside the intercepted contents; Defendant likewise intentionally configured the Website to transmit users' URL contents to each Tracker and permitted each Tracker to use that information for user profiling and targeted advertising. Plaintiff does not assert secondary or aiding-and-abetting liability under the Wiretap Act. To the extent any party or consent exemption under 18 U.S.C. § 2511(2)(d) is asserted, it does not apply, because the interceptions were undertaken for the purpose of committing tortious and unlawful acts independent of the interceptions themselves, including violations of California law and the unauthorized commercial exploitation of Plaintiff's personal information through profiling and targeted advertising, and that purpose existed at the time of each interception.

82. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X. THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against Defendant

83. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

84. Plaintiff brings this cause of action on behalf of herself and the Class.

85. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

86. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each

statutory violation constitutes a predicate unlawful business act or practice under § 17200.

87. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class Members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation, and transmitted no parameter with any of those requests that anonymized the contents or limited the Trackers' receipt or use of them. The harm to Plaintiff and the Class, including the interception and commercial exploitation of personal information and the financial value thereof, is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class Members.

88. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. The Trackers enabled by Defendant used that intercepted URL content to build audience segments and persistent profiles, and advertisers pay measurable prices for access to audiences identified by precisely this kind of browsing activity.

89. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

90. Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by

Defendant through those practices, and reasonable attorney's fees pursuant to California Code of Civil Procedure § 1021.5. Plaintiff seeks equitable relief under § 17200 in the alternative to her legal remedies; she lacks an adequate remedy at law to prevent Defendant's ongoing and future interceptions, which damages cannot redress.

## XI. FOURTH CAUSE OF ACTION

**Violation of the California Constitution, Article I, Section 1**

**By Plaintiff and the Class Members Against Defendant**

91. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

92. Plaintiff brings this cause of action on behalf of herself and the Class.

93. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

94. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs and titles reflecting their reading about debt consolidation and bad-credit lending. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity concerns personal financial subject matter and is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

95. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person researching debt consolidation loans and bad-credit lending options does not expect that the specific pages they read will be covertly transmitted to separate third-party commercial tracking companies in real time, linked to persistent identifiers, and used for advertising targeting, behavioral analytics, and commercial monetization.

96. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL and title contents of Plaintiff's and Class Members' electronic communications and their transmission to third parties, where they were linked to persistent identifiers and used for commercial advertising, marketing-automation, and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the financial-distress and credit-impairment subject matter of the intercepted contents, the persistence of the identifiers transmitted, and the commercial exploitation of the intercepted data.

97. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

## XII. FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against Defendant

98. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

99. Plaintiff brings this cause of action on behalf of herself and the Class.

100. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

101. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding third-party tracking technologies that intercepted the URL and title contents of those

communications in real time and transmitted them to third parties without Plaintiff's knowledge or consent. Defendant publishes the debt-consolidation and bad-credit lending content on its own Website and invites users to read that content, and then intercepts users' engagement with that very content. Plaintiff had a reasonable expectation of privacy in the contents of those communications.

102. The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was browsing and transmitted it to separate third-party commercial entities for advertising targeting and behavioral profiling. The covert and non-consensual nature of the interception, the financial-distress and credit-impairment subject matter of the content browsed, the commercial exploitation of the intercepted browsing activity for advertising and data analytics purposes, and the use of persistent identifiers to link that activity to Plaintiff's browser without disclosure all render the intrusion highly offensive to a reasonable person.

103. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII. <u>SIXTH CAUSE OF ACTION</u>

### Unjust Enrichment

### By Plaintiff and the Class Members Against Defendant

104. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

105. Plaintiff brings this cause of action on behalf of herself and the Class.

106. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

107. Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

108. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

109. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust. Plaintiff pleads this claim in quasi-contract for restitution in the alternative to her legal remedies and lacks an adequate remedy at law as to the disgorgement of Defendant's unjust gains.

110. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;
3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;
11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and
13. Such other and further relief as the Court deems just and proper.

/ / /

/ / /

/ / /

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: August 10, 2026 **NATHAN & ASSOCIATES, APC**

By: *_/s/ Reuben D. Nathan_*
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*